We'll begin with Case No. 22-10614, Kevin Jumlist v. Prime Insurance Co. et al. Mr. Savage, whenever you're ready. Thank you. I'm Brent Savage and I represent the children of Ms. Beaubrun. Some facts are important in this case. There are really two cases. These cases evolve out of the death of two women at a mall shopping center where they were having surgery performed. It's a real oddity. One lady dies, Ms. Jenkins, in February of 2013 and Ms. Beaubrun dies from these surgeries in June of 2013. Involved in this case is a policy for $50,000 for diminishing limits written by a prime insurance company that never qualified to do business in Georgia, sold by a broker that was never qualified to do business in Georgia, and on the face of the policy there is a misrepresentation that this policy was delivered in accordance with Georgia law surplus lines law. None of that is correct in this case. This case is just a mess. There were two cases going. The first case, the Jenkins case, is set for trial in district court in Utah at the end of September of this year. This case, the Beaubrun case, has been thrown out entirely by the trial judge and they are basically the same facts. Can I ask you a question? Yes, sir. So, referencing the Jenkins case, so tell me what happened in Jenkins with respect to this collateral estoppel issue that likewise exists in this case. Didn't the district court in Utah likewise march through a collateral estoppel analysis? They did, but some of the claims survived, which are mainly what I would call negligence or malpractice by a prime insurance company of not passing on offers that we made early in the case. So, that's what survived. The reason I ask is that it seems like collateral estoppel is a big issue in this case and there are sort of two ways to think about it. One is, you know, we might want to do the blocking and tackling of collateral estoppel sort of here and the district court here looked at what the district court in Utah had done with respect to collateral estoppel and sort of took sort of messages from that. The second question is whether there's like collateral estoppel on top of collateral estoppel. Like, is the District of Utah's decision collateral estoppel in this case? No, because I think you've got to look in Georgia, which is where we're sitting and we've got to apply, I think, Georgia law. None of those collateral estoppel issues are over. You have to have a final judgment. There's no final judgment in Utah as to the, that, now Utah law is different. There is a final judgment in the first case. In the declaratory judgment default action. Right. There isn't. We're not a party to that case. But collateral estoppel doesn't require party status all the time as long as you're privy What we've argued in this case is, what happened in this case, I've done insurance work for a long time. You have a company that has one adjuster. That adjuster, Dave McBride, is a lawyer. What he did in this case is remarkable. He adjusted the claim for Dr. Dodds and CLJ, who are the surgeons involved in Beaubrunn and Jenkins. At the same time, he sent his file to a firm, Strong and Haney, to do a declaratory judgment action if they wouldn't settle. That same guy asked for a release, who's a lawyer, from Dr. Dodds, and she would not give him a release in this case. We can cut through some of the morass. Yeah, there's a lot of it. I know. I know. I'm with you. Putting aside collateral estoppel, putting aside what the adjuster did, putting aside for a moment the Surplus Lines Act argument, why isn't this policy properly read to provide for a $50,000 limit for a single occurrence to a single victim? Well, one of the things that's not mentioned in the order by the trial judge in Georgia is Alan Wendt. I mean, you've got to look at it this way. We put tons of things in the record in this case. Alan Wendt is the most quoted treatise writer on insurance in this country, and you've got to look at how it's written. This is a manuscript policy, which means they write it per occurrence. This is not like Travelers that has preset forms. This form says professional liability $50,000 slash $100,000. What do you think that means? I think it means there's $100,000 in coverage. Total for the policy. No, no, no, no, no. If you look at other ... You mean the policy goes over $100,000? I think ... Has to be a cap. There is, and it's $100,000, but it's not $50,000 per incident. What's the $50,000 referred to? For professional liability. This policy covers more than professional liability. What happened here more than professional liability? To the victim. To the victim? Well, they sold a policy ... No, no, no, no. Oh, to the victim. More than professional liability. I'm not talking about liability of the insurance company for any of its misdeeds in the issuance of the policy. I'm talking about what happened during the surgery. That's professional liability, is it not? It's medical malpractice. Right, but there are parts of this that are not medical malpractice. Like what? Well, not having a properly stoked atropine on your cart. Those are ... That's medical malpractice. It is not, in Georgia. It's not. You're telling me that if you are going to perform surgery ... Right. ... and you don't have the materials to perform the surgery, and then the doctor realizes in the middle of the surgery, oh, I don't have that scalpel. I don't have that silk to do the stitches. That's not malpractice? That is correct. That is a garden variety office procedure that you're supposed to have your instruments and things lined up. Well, what's the cause of action, I think Judge Jordan is asking? Against the insurance company? No, against the doctor who fails to have his instruments at the ready. I think they were both in negligence and they were in professional malpractice, both. So how do you read the $50,000, $100,000 limit? I have a big debate in my office when people come in on motions to dismiss. I have a very smart lady who writes briefs for me, is a good lawyer, and she says, well, let's just be purists. Let's not put evidence in. Since I am older, I say, look, I want to put all the evidence in. This was not a motion to dismiss. This was a motion for summary judgment, and nowhere in this opinion does he ever acknowledge the leading treatise writer in this country who wrote an affidavit, and it's in the record, who says, I'm sorry, he said that this is, there are three wrongful acts. The problem with this policy is it says $50,000 professional liability. It doesn't say per act. It doesn't say per wrongful act, like you would have in all the policies that you and I have ever dealt with. He says there are multiple acts of professional negligence in this case. Which led to one harm. But that's not the way the policy is written. In the Army, they tell you not to assume the assumption. We're all assuming, and I know you're very astute on insurance matters, but this is a renegade policy. Have you ever heard of a company? What is that? Is that a term of art, or that's just your description of it? Renegade policy? Yeah. That's my description. Oh, okay. That's savage on insurance. I wanted to make sure it wasn't a term of art within the industry. No. I mean, it says professional negligence, $50,000. You've got to look at SIRs, where they have retention. They have retention for property damage in this case. That's not professional negligence. I'm with you. You're right, $50,000 professional liability. Then it says $100,000 policy aggregate. Right. Aggregate of what? Aggregate of the wrongful acts. So, if you look at Alan Wint's affidavit, that thing cost me an arm and a leg. I hope somebody looks at it. He says that this is a, I don't think he used renegade policy, but it is the manuscript policy, and it doesn't have $50,000 professional negligence per wrongful act. It just says $50,000 professional negligence, and he says there's multiple wrongful acts. In this case, and therefore, the $100,000 was right. A lot of these insurance policies are written industry-wide, or at least region-wide, and they keep copying each other until something goes wrong, and then it gets modified, and then an amended version gets written up, and gets issued, and whatever. There have to be some cases somewhere in the United States interpreting this exact policy to limit language, right? Right. Those are all in Alan Wint's affidavit that I put in in response to their motion to dismiss, which is never mentioned in any of the order by the trial court judge. Okay. I mean, one of the things I think I'd make . . . Question from Judge Carnes. Oh, I'm sorry. Yes, sir. On the Wint's affidavit, that's a bigger issue. We don't generally take affidavits from lawyers, treatise writers, law review article authors, or whatnot on the law, nor should we. Are you arguing for the proposition that we take affidavits, maybe depositions, maybe treatise writers on what the law is, and pick the one we think is the most persuasive? No, I'm not at all arguing that. This man, as it's said in his affidavit, has adjusted 10,000 claims, I think is the amount he puts in there. He's been hired by . . . How about 5,000? Is that enough? We should pay attention to somebody who's done 5,000? That shows that he has . . . What about 500? I don't understand this. We're supposed to take expert testimony on what the law is? Not on what the law is, on what is appropriate procedures for insurance companies. That's the same thing. That's the same thing. The law doesn't say general standard of conduct in the industry. We're interpreting policy language here, aren't we? Right, but that doesn't . . . Okay, then what expertise does he have that we should yield to on how to interpret language in a contract? He has adjusted 10,000 claims, as he puts in his affidavit. He's been hired by every major insurance company to adjust claims, to give them advice on what policy language means. I mean, if it's ambiguous . . . Supposedly, if we're expert on anything this day and age, we're experts on statutory and contract language interpretation. Nobody has moved a doorbell motion that he wasn't qualified. His affidavit stands. I'm moving. I'm moving. I'm sorry you paid a lot of money for the affidavit, but I think you've got less than you paid for, because to me, it's going to be an entirely different day if we have affidavits on what the law is and how we ought to interpret language. Here's where I differ with you. First of all, I'm not sure anybody ever has focused on Wint's affidavit in this case. I mean, it's not mentioned in any finding. If you read . . . And I think what I'm telling you is deservedly so, and I'm giving you an opportunity to tell me why we should share our responsibility, offload some of our duty to interpret contract language to a hired gun treatise writer. Well, that's unfair to him, but I mean, he's not a hired gun. You said, and I quote, it cost me a lot of money. That's what his time is worth, but I'm not saying he's a hired gun. This is ambiguous policy language, and what you're saying to me is a guy who's spent 40 years in the insurance industry cannot give an opinion on what the ambiguous language is in this policy. He can give any opinion he wants to to anybody he wants to, but I don't . . . I have a serious problem with . . . I'm speaking only for myself. We haven't discussed this, because I've never seen it argued before. I don't . . . I'm not willing to give up my responsibility and authority to interpret the language to someone who's written a treatise in the area. It's ambiguous? I think that . . . Well, then you win. I mean, if it is ambiguous, that's a legal question. Don't need an expert for that, but if it's ambiguous, then you win. Don't you? That's what he says in his affidavit, that this is an ambiguity. I mean, in the . . . Well, you're just . . . . . . You're taking my issue . . . Counsel, you're taking my issue and my question one step further. You're saying, in effect, okay, if he can't give an opinion on what this language means, he can give an opinion on whether this language is ambiguous. What it means. Sure, and in ambiguity, absolutely. We just differ. I mean . . . All right, let me . . . We're just going to have to agree to disagree, and my colleagues will have the deciding vote on whose position is correct about that. I see that issue is far more fundamental than any other issue in the case. I don't know how much time I've got left, but I . . . You're way over, but we've taken you over your time. I'm going to sit down. I'm not going to reserve anything, but . . . No, no. You . . . Those were the claims to the fact that this case, he was indicted for murder, which they eventually dropped. These were her first claims ever, and you . . . It doesn't seem to bother anybody. Maybe, I'm too close to it, that you've got a company here that lies on the face of the policy. It says it's approved, and yet, they're going to get all these breaks. Let me ask you this question. You can answer this question, and then you can . . . I'll answer it shortly, and I'm done. I don't mean to anybody disrespect, but I think this is a case that, at least in Utah, we have a former law professor from Brigham Young as our trial judge. We're going to trial unless they win summary judgment, which there's argument . . . We're not talking about that case. But, I mean, it's the same issues. You're trying to put a good lawyer's perspective on your client's case, but this is also a case where, in the insurance company's perspective, we're tendered at the very beginning, so . . . Right. . . . The equities are not completely with you or without you. Now, here's my question to you. How do you have a private right of action under the Georgia Surplus Lines Insurance Act? Those are all set. I mean, I do this all the time. It doesn't . . . There's no case that says that you have a private right of action under that statute. Right. Right. But, all the time . . . You have it. . . . those are in dishes of what is the right thing to do. They set standards that talk about what is negligence if they break these laws. I mean, the state's not done a thing to these people. I mean, Nedra Dodds, who's now my client in these cases, who's the doctor, she's ruined by people that came into the state, sold her a legal policy, lied about whether it had been approved by the state, that, well, I would go back and I'm going to shut up. On the $50,000, here's what a good adjuster should do. We think it's $50,000. We're eventually going to file a declaratory judgment action because we got a question about it. We're going to wait four years, even though our lawyers have pulled out of the case, to say we still have a controversy in the case, and we are not going to tell you in 2014, you can come up with another $50,000 from your parents who put you through medical school. You can borrow it or get it from somewhere else. We're not going to tell you that. That is outrageous behavior on them, and they should answer for it, and they are in the Jenkins case. Okay, Mr. Savage. Thank you very much. You saved your time for rebuttal. Thank you, Judge Garns. I feel like I've taken some liberties, so I don't want to do that. You've got your three minutes left for rebuttal once Mr. Sprinkle is done. All right. Okay, Mr. Sprinkle, let's talk about the policy language. It may not be legally ambiguous, but it certainly could have been written in a clearer way, right? Well, I think the district, or not the district court, the state court in Utah, in the declaratory judgment action, that court determined that there was a $50,000 limit applicable to the BOPA. That's a very good lawyer's answer, because you're asserting collateral estoppel, etc., but my question takes collateral estoppel out of the air for now. My question is, looking at it as a court in the first instance, this language I'm suggesting could have been written in a clearer way. I think, actually, the policy itself is clear. I mean, on the declarations page it says $50,000 professional liability, then on a separate line $100,000 policy aggregate. If you go to the limits of liability section of the policy, that's where it confirms that multiple claims by one or more parties arising out of a single wrongful act or series of related wrongful acts resulting in, or allegedly resulting in, damages suffered by a single resident at the insurance facility shall be considered a single claim. So the policy itself does address the argument that they've tried to make, that you could somehow parse this surgery into separate acts, and that that somehow was going to create separate limits of $50,000, plus $50,000, plus $50,000. The policy itself does address that very issue. So the way you read the policy is that if, in a single day, three liposuction surgeries were performed, all three of them went horribly bad, and all three patients died, the maximum available coverage, in totality, is $100,000 for all three? Correct. Correct, under the aggregate of the policy. I mean, that's the way all insurance policies work, with an aggregate limit, unfortunately. That is what CLJ wanted the policy to be. I mean, certainly, Prime would have sold it, or sold it a policy with much more coverage if they had wanted. That is what they wanted, which was a policy that would apply $50,000 per claim, but then an aggregate of $100,000, and the premium reflects that type of coverage, and that is what CLJ Healthcare wanted in the policy. Premium was a little bit over $3,000, right? Correct. I think it was just under $4,000, correct. But I do think collateral estoppel really bars any of this type of analysis, because the declaratory judgment action by the Utah State Court has already determined that the Bobrin claim was subject to the $50,000 limit, that the Jenkins claim, actually, the separate claim that we've also talked about, that claim had also exhausted its $50,000 at the time the Bobrin claim, the $50,000 was tendered in that, and so no matter whether you even wanted to get to that aggregate, the aggregate had still been met, because $50,000 had been paid in Jenkins, $50,000 was tendered, initially, in the Bobrin claim. Her father refused that tender, did not accept it, therefore, the way the policy works, yes, once they filed suit, defense costs started diminishing the limits of the policy, that standard in most professional liability type policies, where they erode by defense costs and claim expenses. Therefore, once $50,000 in defense costs had eroded the policy, at that point, the defense counsel, per court order, withdrew from the underlying case, but that is the way, normally, these policies work. What is, Mr. Savage gave us his perspective about what's pending in the Jenkins case. So, if the policy limits have been eroded, what's still left in that case? What sort of claims are at issue there? The claims at issue there, your typical bad faith failure to settle extra contractual claims, I mean, there's not a claim that they're just seeking $50,000 under the policy, in that case it's... But that's the same here, they're not seeking just $100,000 here. Correct. I was merely talking about, even if you were to somehow conclude the aggregate limit could somehow just be applicable to the Beaubrunn claim, that wouldn't be the case because the Jenkins claim had already exhausted $50,000 at that point, so that really, under the aggregate, was only $50,000 left, no matter whether you look at just that professional liability limit or the aggregate limit, because at that point, it had been reduced from $100,000 down to $50,000. Can I just press you on the collateral estoppel piece a bit, and you can tell me if I've correctly understood the universe of applicable Utah law. So, there's this 1997 Utah Supreme Court case called Career Services that basically says, so long as there's notice and an opportunity to be heard, that's sort of actual litigation. But then there's this case that comes along 16, 17 years later in the Court of Appeals called Somerville, State v. Somerville. Does that, Chase, ring a bell to you? I think the Utah District Court sort of distinguished it, right? But so, I mean, it seems to carve an exception out of this notice and opportunity to be heard rule for purposes, for default judgments. It says, an issue is likely not actually litigated where the judgment is entered by confession, consent, or default. So why isn't that, I mean, we're here trying to make an eerie guess about a state's law that's 2,000 miles away. Why isn't that binding on us? I think the district court in the Jenkins case, the Utah District Court, where it distinguished that case, I mean, really, its reasoning is correct in that if you were to somehow not grant preclusive effect to a default judgment, it incentivizes people to never participate in them. Well, so I get all that. Like, I understand that. But, you know, our hands, and, you know, maybe the Utah District Court's hands should have been, but our hands are tied, right? I mean, like, we've got a way that we make eerie guesses, and we say, we look to see if the state Supreme Court has said something definitive. If it hasn't, and maybe Tenth Circuit law is a little different, I don't know, but the Eleventh Circuit law is, we look to see if the state Supreme Court has done something definitive. If it hasn't, so if we don't think career services, like, squarely answers the question, then we go a layer deeper, and we say, have the courts of appeals decided this question? And if they have, then we defer to that, absent some clear indication that the state Supreme Court would do something different, right? And so if we don't think career services quite gets it done, then Somerville, like, seems to me to, like, squarely address the default judgment question and answer it against you. And I just don't know that we're at liberty to depart from that. And I apologize, I don't remember exactly the facts in Somerville, but I do remember that it was not quite so clear-cut that every default judgment could never be given preclusive effect, and I could be incorrect about that, but my recollection was it was not quite that deal of analysis as to what it thought Utah law would be on that issue, because it was not quite settled, and went through page after page of very excellent analysis of why it believed that default judgment does need to be given preclusive effect, because as I just discussed, that whole idea that otherwise everyone would just ignore declaratory judgment actions because there would be no incentive to ever participate, because you could always just re-litigate it later if there's not going to be any preclusive effect. I do think even if the court were to conclude collateral assamble doesn't apply here, the policy on its face, the court can take notice of that, the motion to dismiss states the district court was entitled to do so, the policy says $50,000 professional liability. As we also discussed a few moments ago, the policy made clear that a series of related claims are just still one claim under the policy, therefore you can't get past the $50,000. And as Judge Jordan noted earlier, I mean, the reality is Prine tendered the $50,000 as soon as this claim was made, it was tendered before any lawsuit was filed, it was Mr. Jewelmist who refused to take the $50,000 because he and his counsel wanted to assert that the policy should have $100,000 in coverage, and while they certainly may have wished that that was the case, that is not what the policy had. And so I think even if the court has concerns about collateral assamble, which I do think under the analysis by the Utah District Court, this determination that Utah law would conclude that the issue preclusion would apply here, even if that weren't the case, you can look at the policy itself and determine that the limit is $50,000. The complaint itself alleges that Prine did tender the $50,000 before a suit was filed, so there is no dispute about that. And essentially all of plaintiff's claims, counts 1, 2, and 3, are all premised on this idea that there was a breach of contract or negligence or a breach of a fiduciary duty because Prine only tendered $50,000 when they contend there's $100,000. But the fact is when the policy only has $50,000, none of those claims are viable. The District Court correctly concluded that they're not viable, correctly dismissed all of them on that basis. And I could also turn to the statute of limitations issue if you all want or if you all want to continue with the collateral. If you could talk about the surplus lines matter first. I will. Since we talked a little bit about it with Mr. Savage. Okay. The Surplus Lines Insurance Act, essentially what it does is states that a policy delivered in Georgia is required to have a specific surplus lines disclosure form. The policy does state that it's a surplus lines policy. There is a disclosure on the declarations page, but it is not exactly the same as the one that is contained in Georgia Rules and Regulations 120-2-89. However, there is nothing in those rules and regulations or in the statute itself that creates any private cause of action. Instead, it refers to that there may be penalties if there's any violation of the disclosure portion of the rules and regulations. Those penalties would be such that would be imposed by the Georgia Insurance Commissioner, not by some private cause of action that would be asserted by a citizen. Mr. Savage seemed to suggest in his time up here that even without a private right of reasons, negligence, et cetera, by an insurance company. In other words, if an insurance company doesn't comply with the Surplus Lines Act, that can form part of the basis of some type of other claim that's legally cognizable against an insurance company. I would say that if in a case where there maybe were some very unusual exclusion that had been applied and the policy was such that it had something very unusual in that circumstance, then maybe there could be such an argument. But in this case, the surplus lines disclosure had nothing to do with the actual events in the case. What we have is a $50,000 professional liability limit on the policy. There was a professional liability claim made, prime tendered the $50,000 available under the policy. Mr. Jewell misdecided not to accept that tender. And the surplus lines disclosure form on the policy, whether or not it is exactly the form that should have been or not, has nothing to do with any of the key facts in the case. Instead, it's more of just an attempt of creating some type of issue that might be asserted in this case when there really is none because of the fact that the policy limits were $50,000 and that was tendered. In fact, the only case that the Georgia appellate courts have ever even looked at that disclosure requirement is the Tyson v. Scottsdale insurance case. And in that case, the Georgia Court of Appeals held that even a failure to comply with it is not going to render a policy unenforceable or any exclusions in it unenforceable. And indeed, in this case, it's not even entirely clear what plaintiffs are contending that because they don't like that part of the policy that the policy is unenforceable, but at the same time, they contend it should be enforceable and they should be entitled to recover $60,000 or $60 million under, excuse me. I mean, it's just inconsistent what they're trying to argue. And so I would respectfully submit that the surplus lines issue, there is no private cause of action. The one Georgia Court of Appeals case that has looked at it said there was no issue with that somehow invalidating a policy or doing anything else to adjust or change the policy. So I don't view that there was any issue with that and the district court correctly dismissed that count of the plaintiff's complaint as well. The final issue would be, one other issue I will point out, that also surplus lines insurance policies, despite what was said, are not reviewed by the Georgia Department of Insurance. That's OCGA 33521.1. I think there was some discussion earlier by Mr. Savage about how this was never reviewed by anybody in Georgia, but surplus lines policies under Georgia law are not actually reviewed. That is what makes them surplus lines insurance policies. The final issue in the case is briefly the statute of limitations issue. I would point out plaintiffs did not file suit until March 12, 2021, applying the four-year statute of limitations that in Georgia normally applies to any breach of fiduciary duty claim. Anything to be actionable would have to have occurred by March 12, 2017 or later. At that point, the policy... Their argument is that it's not the four-year statute of limitations, but rather a six-year statute of limitations that applies. My argument is a four-year statute of limitations. No, no. I know that's your argument. I'm saying their argument is that, yes, you might be right about the chronology and the It's six years, and therefore, they just get under the window. In actuality, the six-year, even if you were to apply that, there are actually no different events that occurred between that six-year and four-year window. So even though they've made that argument, the policy had actually been exhausted more than six years before they filed suit as well. So even if the court were to decide that the six-year statute of limitations were to apply, the statute of limitations would still bar the claims in this case. When is accrual? That... Correct. Under Georgia law, those claims accrued when the first wrongful act occurred and damages occurred. So based upon plaintiff's allegations that the policy should have had more than $50,000, that would have accrued back when Prime tendered $50,000 because that would have allegedly been incorrect. And then once defense costs started eroding the policy to the point where the policy was those claims would have accrued. Okay. Thank you very much. Thank you. Thank you. Let's talk about this $50,000 because it makes us look bad. They tendered $50,000, they're great Americans, and you didn't take it. It's not a question of making anybody, Mr. Savage, it's not a question of making anybody look bad. No, no. I've got a response on it. You got to look at what was attached to the $50,000. They wanted all agents. We've never talked about the CRNA this morning who was at the Beaubrun surgery, failed to monitor any of her vital signs, and she died. He had a million dollars in coverage. They wanted all the agents with the $50,000. That's what their offer is. We'll pay you $50,000, but we want all of the agents of the insured. That would have taken a million dollars off the table by a guy who was insured by CNA. You would have taken $100,000 and taken the release to take the CRNA off the table? I would have taken ... No. I would have taken ... Of course not. Right. That's a good point back, but all I did is react to their offer on this, which was you got to take ... We'll give you $50,000 and we're going to ... They never offered $100,000. The bad faith is that they offered $50,000 when they should have offered $100,000 or that they demanded releases? There you go. Then the $50,000, $100,000 is meaningless to your argument. You got to go further. This is something that 45 years of doing this, there's probably very few areas of law I can play back at you. In this thing, I would have got a limited liability release. They wanted a complete release of all agents. That's different. It's not a limited liability release. This is a lawyer who's doing this. You got to take the $50,000 plus what they tendered, and they wanted a complete release for all agents. They didn't offer a limited liability release, anything like that. Right. You reasonably rejected it. Right. Then they ran down the $50,000 with defense costs. Yeah. I've said what I think on the $50,000 thing. I've got two experts in the Jenkins case, one in this case. All three of them say $50,000 professional liability is not the way you rate a policy if that's your cap in this case. Does this policy cover anything but professional liability? Yes. What does it cover that's not professional liability? It covers custodial type activities. There's a case out of Savannah Candler Hospital, a case where a person gets pushed off of a table during a surgery, and they get hurt. They said that's not professional liability stuff. This is not professional liability where to save this woman's life, they didn't have a cart with Atropine on it. All right. Thank you very much, Mr. Sanders. Thank you, sir. Thank you, Judge Garns. We didn't get that. We didn't get that. Gentlemen. Thank you, Chief. Have a good trip. Okay, come on up. Case number two. Number 21.